IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**PETER BANKS**                                                            **PLAINTIFF**

**v.**                        Case No.  **4:20-cv-00182 KGB**

**MICHAEL MOORE, individually and in**
**his official capacity as a police officer for**
**the City of England, Arkansas**                              **DEFENDANTS**

## OPINION AND ORDER

Plaintiff Peter Banks filed this action against separate defendants Michael Moore, individually, and Michael Moore, in his official capacity as a police officer for the City of England, Arkansas ("the City") (collectively "Defendants").  Mr. Banks claims that his First Amendment, Fourth Amendment, and substantive and procedural Due Process rights were violated by Defendants in violation of the United States Constitution, with corresponding claims alleging violations of the Arkansas Constitution, all of which are brought pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-101 *et seq*. (Dkt. No. 8, ¶ 3).  Mr. Banks also asserts state law claims of assault and battery, malicious prosecution, abuse of process, and felony tort (*Id*., ¶¶ 45-54).  Mr. Banks claims that the City failed to train properly Officer Moore on the probable cause necessary for arrest and that his blood was seized without probable cause and without a proper warrant "in accordance with City policy and custom" (*Id.,* ¶¶ 24, 25, 30, 31).

Before the Court is the Defendants' joint motion for summary judgment (Dkt. No. 49). Also before the Court is Mr. Banks's motion for stay, response to Defendants' joint motion for summary judgment, and request for hearing of Mr. Banks (Dkt. No. 58).  Defendants replied to Mr. Banks's response to Defendants' motion for summary judgment (Dkt. No. 63).  Mr. Banks

filed a reply to response to motion to stay and sur-reply (Dkt. No. 66).  For the reasons that follow, the Court denies Mr. Banks's motion to stay and motion for hearing (Dkt. No. 58).  The Court grants Defendants' joint motion for summary judgment and declines to exercise supplemental jurisdiction over Mr. Banks's state law claims (Dkt. No. 49).

I.      **Mr. Banks's Motion For Stay And Request For Hearing**

In his response to Defendants' joint statement of undisputed material facts, Mr. Banks responds to several paragraphs asserting the following:

> Plaintiff has significant doubts about the authenticity [of the warrant].  The warrant was never returned to E[ngland ]P[olice ]D[epartment].  There are doubts about the timeline that Mr. Moore has given.  There has been evidence to contradict and corroborate his timeline which in itself create a material fact in dispute that warrant a denial of summary judgment since this goes to the credibility as well as the objective reasonableness of Officer Moore.  But under his facts, it was objectively and subjectively unreasonable to wait to draw the blood after the 4 hour window expired.  The Response should be stayed.

(Dkt. No. 59, ¶¶ 46, 47, 48, 49, 50, 51).  Mr. Banks later makes clear in his motion for stay and request for hearing, and then later in his request for hearing and brief in support of his reply to response to motion to stay and sur-reply, that he seeks to stay the proceedings in order to conduct further discovery "to obtain a handwriting sample from the Circuit Judge and hire an expert in order to determine whether the Order is genuine." (Dkt. Nos. 58; 67, at 14).

This Court may, in its discretion, stay proceedings before it pending resolution of a motion brought pursuant to 28 U.S.C § 1407.  "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Cottrell v. Duke*, 737 F.3d 1238, 1248 (8th Cir. 2013) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997) (same).  Further, "[a] district court has broad discretion

to stay proceedings when doing so is appropriate to control its docket." *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006)). "A Court may properly stay an action where the following criteria are met:  (1) the stay does not prejudice the non-movant; (2) the movant would suffer hardship and inequity without a stay; and (3) the stay serves the interests of judicial economy and efficiency." *Adams v. Tyson Foods, Inc.*, Case No. 07-cv-4019, 2007 WL 1539325, at *1 (W.D. Ark. May 25, 2007) (citing *Rivers*, 980 F. Supp. at 1358).

Mr. Banks bases his motion for a stay on the testimony of the Lonoke County Sheriff John Staley, who he asserts testified that "Judge [Sandy Huckabee] cannot remember signing the Warrant" (Dkt. No. 67, at 14).   Sheriff Staley testified:

> Q.    Have you spoken to Judge Huckabee about this warrant?
>
> A.    Well, when it come through, I asked him if he remember it, and he says that, you know, we do so many and so long, you know, he would have to see if it was returned and filed with the clerk.  But I didn't get – he said that it could have been, but I can't testify for him, of course, but, when I asked about it, there's some, that –
>
> Q.    Right.

(Dkt. No. 59-1, at 25).  The Court has reviewed Sheriff Staley's testimony and determines that it does not support Mr. Banks's assertion that Judge Huckabee cannot remember signing the warrant. At most, Sheriff Staley's testimony is that Judge Huckabee could not remember if the search warrant was returned and filed with the clerk.

Mr. Banks subpoenaed Judge Huckabee for a deposition earlier in this case. Judge Huckabee filed a motion to quash the subpoena in which he states that he signed a search warrant permitting officers to draw blood from Mr. Banks (Dkt. Nos. 17; 24, ¶ 4).  This Court granted Judge Huckabee's motion to quash the subpoena because he is entitled to judicial immunity (Dkt. No. 31).

3

Mr. Banks asserts in his request for hearing and brief in support of plaintiff's reply to response to motion to stay and sur-reply that he should be allowed to depose Judge Huckabee to "ask the Judge what representations Moore made to him, in order to explore a *Franks* violation and the issue of whether the warrant was stale." (Dkt. No. 67, at 14).  As the Court stated in its Order granting Judge Huckabee's motion to quash Mr. Banks's subpoena, a judge cannot be required to testify regarding his mental process in formulating an official judgment.  *United States v. Morgan*, 313 U.S. 409, 422 (1941); *see also Cavitt v. Wills*, Case No. 2:06-mc-42, 2006 WL 3792046, at *1 (W.D. Ark. 2006) ("The overwhelming authority concludes that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties.").  Mr. Banks has already deposed Officer Moore regarding his version of the events and telephone records establish that Judge Huckabee received a call on the on-call line in the early morning hours consistent with Officer Moore's version of the events.

To the extent Mr. Banks seeks to challenge Judge Huckabee's signature on the warrant, the Court agrees with Defendants who point out in their joint reply to Mr. Banks's response to their motion for summary judgment, that there are ample public records available with Judge Huckabee's signature on them that Mr. Banks could have used to compare Judge Huckabee's signature (Dkt. No. 63, at 10).  Mr. Banks has not presented evidence from a handwriting expert despite having ample opportunity to do so.  Accordingly, the Court is not inclined to stay these proceedings to permit Mr. Banks further discovery on that issue.

Mr. Banks relies on *Birchfield v. North Dakota*, 579 U.S. 438, 136 S.Ct. 2160 2185 (2016), to assert that the Court should grant summary judgment because Officer Moore subjected him to an illegal search, and he was illegally prosecuted for his refusal (Dkt. No. 67, at 1-2).  However,

Mr. Banks's case is not like *Birchfield* which involved a *warrantless* blood test. Here, Officer Moore obtained a warrant to draw Mr. Banks's blood, and the ruling in *Birchfield* is not applicable.

The *Franks* standard governs whether this Court should conduct an evidentiary hearing. Under that standard:

> [t]here is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.

*United States v. Mims*, 812 F.2d 1068, 1074 (8th Cir. 1987) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). Here, Mr. Banks has not come forward with any proof other than allegations of falsehood. Accordingly, the Court denies Mr. Banks's request for a hearing and his request for a stay of these proceedings to permit Mr. Banks to conduct further discovery from Judge Huckabee.

## II.    Defendants' Joint Motion For Summary Judgment

### A.    Factual Background

Defendants filed a joint statement of undisputed material facts (Dkt. No. 50). Mr. Banks filed a response to Defendants' joint statement of undisputed material facts (Dkt. No. 59). Local Rule 56.1(b) of the United States District Court for the Eastern and Western Districts of Arkansas requires a non-moving party to supply the Court with a statement of material facts "as to which it contends a genuine issue exists to be tried." *See Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011). Mr. Banks opted not to provide the Court with a statement of material facts as required by the Local Rule. Defendants addressed Mr. Banks's response to their joint statement of undisputed material facts in their reply to Mr. Banks's response to Defendants' motion for summary judgment (Dkt. No. 63).

1.      **Genuine Disputes Of Material Facts**

Mr. Banks admits a majority of Defendants' undisputed material facts, but he denies some and objects to others (Dkt. No. 59).  In Defendants' joint reply to Mr. Banks's response to Defendants' motion for summary judgment, Defendants argue that Mr. Banks has not demonstrated the existence of a genuine issue of material fact as to several of the statements of undisputed material facts that he denies or to which he objects (Dkt. No. 63, at 1-11).  The Court will discuss each of these statements of material facts to determine whether Mr. Banks has demonstrated the existence of a genuine dispute of fact.

Federal Rule of Civil Procedure 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Under Federal Rule of Civil Procedure 56(e), "[i]f a party fails to properly support an assertion of fact as required by Rule 56(c), the court may:  (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

Mr. Banks asserts in response to several of Defendants' joint statements of undisputed material facts that Officer Moore testified that he did not "observe Banks break any traffic laws"

and that Officer Moore has "conceded that he went to the Judge because Banks threatened to sue him." (Dkt. No. 59, ¶¶ 1, 2, 4, 8, 10, 13, 14, 27). Defendants argue in their joint reply to Mr. Banks's response to their motion for summary judgment that the referenced testimony does not support Mr. Banks's characterization of Officer Moore's testimony (Dkt. No. 63, at 3-7). Officer Moore testified in relevant part as follows:

Q.   All right.  Well, I'm – I'm asking you about the video.  Was the video that you saw continuous?

A.   Once again, sir, I don't know – did I watch the video?  Yes.  Did it bring back memory of it?  Yes.  Was it continuous?  There were two different portions, so I think that my camera did turn off on itself.  I may have turned it back on.  I – I don't know.

Q.   So –

A.   I just –

Q.   That's Okay.  Go ahead and finish you answer.  I didn't mean to cut you off.

A.   So I just can't honestly say that I remember the incident because it was – it was a – it wasn't a routine traffic stop.  It went from – the – changed from a traffic stop to a reasonable suspicion to probable cause, so I just – I don't know all – the details.  I don't know how long I was there.  I don't know – I didn't do a crime reference.  I just don't know, nor do I remember at this point.

Q.   Okay.  So what was your reasonable suspicion for turning over—for pulling over Mr. Banks?

A.   Well, so we just had a bunch of vehicles—we had a tractor trailer that was stolen that night or not that night, but a couple of—about a week before and it was a gang network before between Humphrey and Little Rock and what they were doing is they were coming out—we did a video on this.  They were coming out to England stealing farm equipment, especially on trailers, and then they were using the back roads instead of coming through the main street because they knew we were sitting down there.  That's normally where I sat over in the large open area so I could see approaches from all sides.  So I originally picked up on the vehicle on—I think it was Taylor Street.  Like, I'm sitting there totally blacked out watching the area and I hear this loud noise.  I saw a vehicle.  It was going way faster than 25 miles

an hour, so it was past the library. I think that's Taylor Street, and then that's when I turned around. My vehicle was running. I turned around and tried to overtake the vehicle at that point. I think he saw me behind him when he made that left-hand turn onto the main street. I think that's the time that I caught up to him. Once I saw that, his speed got a little bit faster than the posted speed limit, but not much. I didn't see any type of driving per se for DUI purposes. He didn't go over the line or anything. He stayed the time in that threshold. Normally when people come down and they're using the back roads, they come down through the light. I knew then he knew where I was, that I was behind him, but I figured, A, he was either going to hang a right-hand turn to go to work because a lot of the gentlemen work early in the morning if they lived there. If he didn't know where he was, he would go straight and I just thought that the guy knew he was lost, but I also wanted to try to find out did he belong here. Once I ran the tag and it came back to Little Rock and kind of went straight, so I said let me see what this guy is all about, and, you know, having the vehicle, the tractor trailer stolen at that point in time, we started talking to people. Most times people would say, hey, so and so, how are you doing and you kind of talk to find out who they are, and at 2:30 in the morning, that's the time frame that—that they were—they were stealing that they lose it, go off to, I guess, go and watch videos, I guess. I don't know, but these guys with the video, he was pretty detailed and he knew—he knew about England PD because they did their homework. Well, he didn't expect me to be watching from the back. In fact, I mean I tried to patrol till 5:00 in the morning and then I would go and do my paperwork. Does that answer your question, sir?

(Dkt. No. 59-7, at 51-54). Officer Moore testified that he saw a vehicle going "faster than 25 miles an hour," on Taylor Street, and that Mr. Banks's speed "got a little bit faster than the posted speed limit." The Court determines that even reading the testimony in the light most favorable to Mr. Banks, the referenced portion of Officer Moore's deposition testimony does not support Mr. Banks's assertion that Officer Moore testified he did not observe Mr. Banks break any traffic laws. *See Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (a party seeking to defeat summary judgment must substantiate allegations with sufficient probative evidence permitting finding in his favor based on more than speculation or conjecture.).

Mr. Banks points to a different portion of Officer Moore's deposition testimony presumably to support his assertion that Officer Moore has "conceded that he went to the Judge

because Banks threatened to sue him."  The Supreme Court has repeatedly emphasized, however, "that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *See Devenpeck v. Alford*, 543 U.S. 146 (2004).  Consequently, the Court agrees that Officer Moore's reason for seeking a warrant has no bearing on whether there was probable cause to support the warrant.

In his response to Defendants' joint statement of undisputed material facts, Mr. Banks denies paragraph four stating the following:  "[n]one of the articulated reasons support probable cause for detaining Mr. Banks on the side of a dangerous road late on Saturday night\Sunday morning in an effort to fabricate probable cause to profile Banks.  Moore has testified that he didn't observe Banks break any traffic laws, Ex. G at Pp. 50-54.  Moore has also conceded that he went to the Judge because Banks threatened to sue him. Ex. G at Pp. 63-64." (Dkt. No. 59, at 3).

Defendants cite to the England Police Department ("EPD") incident report, along with Officer Moore's deposition and the deposition of EPD Chief Dana Powell, as support for paragraph four of their joint statement of undisputed material facts (Dkt. No. 50-2).  Mr. Bank has not challenged the admissibility of the report or Chief Powell's testimony (Dkt. No. 59, ¶ 4).  For the reasons stated above, the Court rejects Mr. Banks's challenges to Officer Moore's testimony.  Accordingly, the Court deems paragraph four of defendants' joint statement of undisputed material facts admitted.

Mr. Banks denies paragraph 22 of the defendants' joint statement of undisputed material facts (*Id*., ¶ 22).  Mr. Banks asserts that his conduct is protected speech that is permitted under the First Amendment (*Id*., ¶ 22).  Defendants in their joint reply to Mr. Banks's response to Defendants' motion for summary judgment point out that Mr. Banks's protected speech can be perceived by a law enforcement officer as a sign of intoxication.  Mr. Banks cites to no evidence

in the record to deny Defendants' statement of undisputed facts. Mr. Banks does not challenge the admissibility of the EPD incident report (*Id*.). Accordingly, the Court deems paragraph 22 of defendants' joint statement of undisputed material facts admitted.

Mr. Banks denies paragraph 23 of the Defendants' joint statement of undisputed material facts (*Id*., ¶ 23). Mr. Banks cites to the deposition testimony of Richard Powell to support the denial (*Id*.). Defendants challenge whether Mr. Powell is qualified to testify. However, the Court determines that Mr. Banks denies properly paragraph 23 of the Defendants' joint statement of undisputed material facts and deems the statement of fact disputed (*Id*., ¶ 23).

Mr. Banks denies paragraphs 26 and 56 of Defendants' joint statement of undisputed material facts that state the observations of Officer Williamson, who observed that Mr. Banks's eyes were bloodshot red and watery and that the strong, stale odor of an alcoholic type beverage emitted strongly on his breath while speaking, and paramedic Allison Anderson, who observed the "strong smell of ETOH coming from" Mr. Banks (*Id*., ¶¶ 26; 56). Mr. Banks points to his deposition, his affidavit, and his brother's affidavit in support of the denial, but none of the evidence Mr. Banks points to contradicts the evidence in the record cited by the Defendants (*Id*.). Accordingly, the Court deems paragraphs 26 and 56 of Defendants' joint statement of undisputed material facts admitted.

Mr. Banks admits in response to paragraph 45 of Defendants' joint statement of undisputed material facts that "Officer Moore completed an affidavit for a search warrant to withdraw blood from Plaintiff" (*Id*., ¶ 45). Mr. Banks objects in response to Defendants' paragraphs 46, 47, 48, 49, 50, 51, and 85 (*Id*., ¶¶ 46, 47, 48, 49, 50, 51, and 85). Mr. Banks's further response to most of these paragraphs is something similar to the following:

> Plaintiff has significant doubts about the authenticity [of the warrant]. The warrant was never returned to EPD. There are doubts about the timeline that Mr. Moore

> has given.   There has been evidence to contradict and corroborate his timeline
> which in itself create[s] a material fact in dispute that warrant a denial of summary
> judgment since this goes to the credibility as well as the objective reasonableness
> of Officer Moore.   But under his facts, it was objectively and subjectively
> unreasonable to wait to draw the blood after the 4 hour window expired.   The
> Response should be stayed.

(*Id*., ¶¶ 46, 47, 48, 49, 50, 51).

In response to paragraph 85 of Defendants' joint statement of undisputed material facts Mr.

Banks states:

> [t]his statement contains a citation to the docket which is improper.   These
> documents cannot be admissible responding to a nullity under Rule 56.   Plaintiff
> argues that the fact whether Judge Huckabee signed the search warrant is a fact in
> dispute.   The original warrant was lost and this a mere photocopy that could have
> easily been altered to support Officer Moore's malfeasance.   Plaintiff should be
> allowed to depose Judge Huckabee and obtain a handwriting sample in order to
> retain a handwriting expert.

(*Id*., ¶ 85).

Mr. Banks does not point to materials in the record to support his denial of Defendants'

statements of fact regarding the search warrant obtained by Officer Moore as required by Federal

Rule of Civil Procedure 56(c).   Further, Mr. Banks's responses to these paragraphs do not actually

address the facts asserted by Defendants in the paragraphs which are supported by evidence in the

record (*Id*., ¶¶ 46, 47, 48, 49, 50, 51, 85).   Mr. Banks has not presented evidence sufficient at this

stage for the Court to deny paragraphs 46, 47, 48, 49, 50, 51, and 85, and the Court denies Mr.

Banks's request to stay to permit further discovery.   Accordingly, the Court deems paragraphs 46,

47, 48, 49, 50, 51, and 85 of defendants' joint statement of undisputed material facts admitted.

Mr. Banks denies paragraphs 63, 65, and 67 of Defendants' joint statement of undisputed

material facts based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (Dkt.

No. 59, ¶¶ 63, 67).   Mr. Banks, however, challenges the testimony of his own witness, a forensic

toxicologist for the State of Arkansas, who was being questioned by Mr. Banks's attorney (*Id*.).

Mr. Banks did not file a *Daubert* motion to exclude the testimony in the time permitted by the Court's Amended Final Scheduling Order nor did Mr. Banks seek an extension of time in order to file a motion to exclude the testimony (Dkt. No. 16).   The Court determines that Mr. Banks has not raised a proper objection to paragraphs 63, 65, and 67, and the statements of facts in paragraphs 63, 65, and 67 are deemed admitted (Dkt. No. 59, ¶¶ 63, 65, 67).

Mr. Banks objects to paragraph 64 which states that "[o]vertime, if a person does not continue drinking, blood alcohol will decrease." (*Id.*, ¶ 64).  Mr. Banks objects based on Federal Rule of Evidence 403 and states that "his lab does not project backwards." (*Id.*).  Mr. Banks does not provide a citation to the record.  Mr. Banks does not explain how the statement is prejudicial or confusing under Federal Rule of Evidence 403.  Accordingly, the Court overrules the objection to paragraph 64.

Mr. Banks denies paragraph 71 of Defendants' joint statement of undisputed material facts (*Id.*, ¶ 71).  Mr. Banks does not support his denial with any citation to the record (*Id.*).  Accordingly, the Court deems paragraph 71 of Defendants' joint statement of undisputed material facts admitted.

Mr. Banks denies paragraph 79 of Defendants' joint statement of undisputed material facts pointing to deposition testimony of Sheriff Staley to support the denial (*Id.*, ¶ 79).  The Court has reviewed the testimony of Sheriff Staley and does not find that he testified that he informed Chief Powell, prior to hiring Officer Moore, that Officer Moore had "credibility issues" as represented by the Defendants.  Accordingly, the Court deems paragraph 79 of Defendants' joint statement of undisputed material facts admitted.

2.        **Undisputed Material Facts**

Defendants filed a joint statement of undisputed material facts (Dkt. No. 50).  Mr. Banks filed a response to defendants' joint statement of undisputed material facts (Dkt. No. 59).  The following facts are taken from both defendants' statement of undisputed material facts and portions of Mr. Banks's response that are supported by the record.  To the extent the parties disagreed on purported statements of undisputed material fact, the Court has not deemed those facts undisputed unless otherwise noted herein.  In reaching a determination on the pending motion for summary judgment, the Court has reviewed the record evidence in this case in the light most favorable to Mr. Banks, as the Court is required to do at this stage.

In the very early morning hours of July 22, 2018, Mr. Banks was called by his brother, who asked Mr. Banks if he could come pick him up, and Mr. Banks went and picked his brother up from a family member's house (Dkt. No. 39, ¶ 1).  Shortly after having dropped off his brother, Mr. Banks saw defendant then EPD Officer Moore's patrol unit, so Mr. Banks went down the road and said to himself, "I'm going to see what's on his mind.  I'm going to see if this man going to follow me the whole time," so Mr. Banks stopped at the stop sign, sat there for a minute, and Officer Moore sat behind him, so Mr. Banks pulled off, went to the next stop sign, sat there for a minute, and Officer Moore stayed behind him; Mr. Banks kept going, got on one of the main roads, and decided he was going to make a circle and go to the house (*Id*., ¶ 2).  Mr. Banks got to a stop light, stopped at the light, went past the light, and Officer Moore turned on his lights and banks pulled over at approximately 2:49 a.m. (*Id*., ¶ 3).

Officer Moore stopped Mr. Banks's vehicle due to the following:

- Based on the recent intelligence from a video-taped interview, a gang network was driving in from Little Rock to steal and carry away trailers and farm equipment;

- The hours the informant stated they attempted to steal were between the hours of 0100 and 0500 hours, and it was approximately 0300 hours;

- Officer Moore had made a recent arrest and recovered a stolen trailer, and the suspects were using the back roads to navigate around the city, much like the suspect vehicle;

- Based on officer experience, it is common for a person who is wanted to drive directly with a series of left or right turns and return to the safe space that they left from;

- Based on officer experience, it is common for a person who is under the influence to panic when marked units are behind them and drive in circles;

- The license plate number returned from Little Rock which was where the gang network worked from; and

- Officer Moore was not familiar with and had not seen the pickup truck operating in the area recently and the operator seemed to be disoriented

(Dkt. No. 50, ¶ 4).

Officer Moore came to Mr. Banks's passenger side window, Mr. Banks rolled that window down, Officer Moore asked how he was doing, Mr. Banks asked why he was stopped, and Officer Moore said that it looked like he was lost (Dkt. No. 59, ¶ 5). Officer Moore said he saw Mr. Banks make a "big old circle and that Moore observed Banks speeding on Taylor Street" (*Id.*, ¶ 6). Officer Moore instructed Mr. Banks to step out of the vehicle, and Mr. Banks complied (*Id.*, ¶ 7). Officer Moore asked Mr. Banks where he lived to which he replied that he lived right down the street (*Id.*).

Officer Moore asked Mr. Banks if he had had anything to drink and where he had been, and Mr. Banks stated that he had just dropped his brother off at his house and then accused Officer Moore of following him for a long time (*Id.*, ¶ 8).  Officer Moore told Mr. Banks to sit back in his vehicle (*Id.*, ¶ 9).  Mr. Banks asked Officer Moore why he stopped him (*Id.*).  Mr. Banks asked Officer Moore if he was going to jail and told Officer Moore that he wanted to obtain a lawyer (*Id.*).  Officer Moore returned to his patrol vehicle and filled out a warning to Mr. Banks (*Id.*, ¶ 10).

Officer Moore asked Mr. Banks to confirm that his brother lived down the street (*Id.*, ¶ 11).  Mr. Banks responded that he did.  Officer Moore asked Mr. Banks if the address on his driver's license was correct, to which Mr. Banks would only respond that he lived "down the street." (*Id.*, ¶ 12).  Officer Moore then told Mr. Banks that he wanted Mr. Banks to call someone to come pick him up because Officer Moore believed that Mr. Banks had been drinking or was under the influence of something and that Officer Moore "was trying to avoid a situation from getting bigger;" Officer Moore also told Mr. Banks that Mr. Banks is "very lethargic and [his] speech is not normal." (*Id.*, ¶ 13).  Mr. Banks responded by stating that Officer Moore stopped him "for no reason." (*Id.*, ¶ 14).  As Officer Moore again tried to explain to Mr. Banks why he stopped him, Mr. Banks began to interrupt Officer Moore's explanation; Officer Moore told Mr. Banks that his driving behavior suggested that he was under the influence or was lost (*Id.*, ¶ 15).

Mr. Banks stated that he was not under the influence of drugs or alcohol, and Officer Moore stated that he did not believe Mr. Banks and that he was asking Mr. Banks to call someone to come pick Mr. Banks up (*Id.*, ¶ 16).  Mr. Banks's response was to tell Officer Moore that Officer Moore was in the wrong and to either take Mr. Banks to jail or to let him go about his business (*Id.*, ¶ 17).  Mr. Banks again argued with Officer Moore, stating that if Officer Moore thought that he was

doing something wrong then to "go on and take me to jail;" Mr. Banks also stated that he was not going to call anyone to come get him because he "was not under the substance of alcohol or anything." (*Id*., ¶ 18).  Officer Moore requested that Mr. Banks step out of his vehicle, and Mr. Banks did so (*Id*., ¶ 19).

Officer Moore requested another patrol unit to come to the scene and to bring a portable breathalyzer test ("PBT") to administer after he conducted field sobriety tests on Mr. Banks (*Id*., ¶ 20).  Officer Moore advised Mr. Banks that another officer was coming to the scene with a portable breath alcohol test, and Mr. Banks responded, "I don't care what you have over here, until you tell me why you stopped me," and "I am not taking nothing until you tell me why you stopped me and you have not told me that." (*Id*., ¶ 21).  Officer Moore told Mr. Banks to relax and then instructed Mr. Banks to sit on his tailgate but was once more met with a constant, antagonistic attitude, aggressive demeanor, and verbal noncompliance, with Mr. Banks informing Officer Moore that Officer Moore might as well arrest him and tow his truck because Mr. Banks had a lawyer and would own Officer Moore and his job (*Id*., ¶ 22).

EDP Officer Brandon Williamson arrived on scene at approximately 3:06 a.m. to assist with the field sobriety tests and with the PBT (*Id*., ¶ 24).  Mr. Banks, while standing in the street, then began yelling at Officer Moore to take him to jail, at which point Officer Moore placed handcuffs on him (*Id*., ¶ 25).  While Officer Williamson was escorting Mr. Banks to his patrol unit, Officer Williamson observed that Mr. Banks's eyes were bloodshot red, watery, and the strong stale odor of an alcoholic type beverage emitted strongly on his breath while speaking (*Id*., ¶ 26).  Officer Williamson stated at the scene that he could smell alcohol on Mr. Banks (*Id*., ¶ 27).

Officer Moore requested a tow service to secure Mr. Banks's vehicle and began to conduct an inventory of the vehicle.  During the inventory, Officer Moore discovered in the back

floorboard, within the control span of the vehicle operator, a white Styrofoam cup, ¾ full of a yellow liquid beverage which smelled strongly of alcohol mixed with unknown diluent (*Id.*, ¶ 29). Mr. Banks denies that the cup was his (*Id.*).  Officer Moore was aware that it was common and fashionable for a mixture of alcohol and codeine or other type of narcotics to be mixed together known as "lean" or "sizzurp" (*Id.*, ¶ 30).  The cup filled with yellow liquid that was found in Mr. Banks's truck was, according to Mr. Banks, left in the truck by his brother, who had been drinking (*Id.*, ¶ 31).  Officer Moore secured the beverage for chemical analysis, completed the tow sheet, and the vehicle was towed (*Id.*, ¶ 32).

Officer Moore did not use any racially derogatory terms, racial slurs, or call Mr. Banks any names outside of his name during their interaction (*Id.*, ¶ 34).  The arrest by Officer Moore caused Mr. Banks no physical injury (*Id.*, ¶ 35).

After he was arrested, Mr. Banks was transported to the EPD jail by Officer Williamson in order to be administered a Blood Alcohol Content ("BAC") test (*Id.*, ¶ 36).  EPD dispatcher supervisor, James Paulus, was asked by Officer Moore to administer the BAC test to Mr. Banks (*Id.*, ¶ 37).  Officer Paulus began his observation time at 3:15 a.m., and at approximately 3:25 a.m. Office Paulus began reading the Arkansas Statement of Rights Form (Act 106) to Mr. Banks (*Id.*, ¶ 38).  While reading the form out loud to Mr. Banks, Mr. Banks was verbally argumentative and stated that he was not agreeing to or signing anything.  So, Officer Paulus discontinued the reading, wrote refused on all of the spaces where Mr. Banks should have initialed and signed, and then Officer Paulus signed and dated the rights form (*Id.*, ¶ 39).  Officer Paulus ran a subject test on the BAC machine, and pressed "R" for subject refusal (*Id.*).  Officer Paulus then confirmed that Mr. Banks was refusing the BAC test and signed the tickets that were printed (*Id.*, ¶ 41).  Officer Paulus filled   out   the   front   page   of   the   Officer   Driver   License   Receipt   and   Notice   of

Suspension/Revocation or Disqualification of Driving Privilege form, and all documents were dispersed according to protocol (*Id.*, ¶ 42).  Mr. Banks was placed into jail cell number two (*Id.*, ¶ 43).

Officer Moore photographed the Styrofoam cup and the liquid in it before packaging and completing all documentation (*Id.*, ¶ 44).

Officer Moore completed an affidavit for a search warrant to withdraw blood from Mr. Banks (*Id.*, ¶ 45).  The warrant stated as follows:

> An Affidavit have been before me, by Patrolman Michael N Moore, of the England Police Department, having been duly sworn, stated he has reason to believe and upon probable cause does believe, that on the person commonly known as; Peter R Banks, withdraw a Blood serum sample from his body due to refusal to submit to a chemical test, there is now being concealed certain controlled substances, to wit: all and any controlled substances; tending to demonstrate that a criminal offense has been committed and there exists reasonable cause to believe that the above conditions and facts do exist and a Search and Seizure Warrant should be issued.
>
> On 22, July at 0251 hours the defendant, Peter Banks was detain based on a reasonable suspicion traffic stop.  The Defendant was the operator of a 2016 GMC Sierra Pickup truck (LPN M2415).  The Affiant then smelled the strong sour/stale of an alcoholic beverage emitted on the defendant's breath.  The affiant also observed the Defendant's speech to be very lethargic and words slurred.  The Defendants eyes were bloodshot red and water.  The Defendant refused to submit to Standardize Field Sobriety Testing (SFST) and the Portable Breath Alcohol test (PBAT).  The subject was then placed into Lawful custodial arrest and transported to England Police Department.  The Vehicle was inventoried and the affiant discovered an alcoholic beverage, which appeared to be mixed with an unknown narcotic and alcohol, commonly known as Sizzurp or Lean.  The Defendant then refused to submit to a chemical test and to be finger printed, which effects the ACIC database.

(*Id.*, ¶ 46).

The affidavit is signed by Officer Moore as the affiant on July 22, 2018, at 6:00 a.m. (*Id.*, ¶ 47).  Officer Moore contacted the on-call judge, the Honorable Sandee Huckabee, a Circuit Court Judge in Lonoke County, who granted the search warrant (*Id.*, ¶ 48).  Officer Moore and Officer Williamson both left the EPD around the same time—either just before or after 6:00 a.m.—Moore

to meet Judge Huckabee in Cabot, and Williamson to meet an Arkansas State Trooper at the Sherwood Police Department to obtain a blood kit (*Id*., ¶ 49).   Officer Moore then met Judge Huckabee in Cabot, secured Judge Huckabee's signature on the affidavit and the warrant, and returned to the EPD (*Id*., ¶ 50).   The phone records for the phone that was being carried by Judge Huckabee reflect that Judge Huckabee took a phone call at approximately 09:58:20 UTC (04:58:20 Central Standard Time) the morning of Mr. Banks's arrest, that lasted approximately two minutes and 28 seconds.   The originating number and the terminating number reflect that the on-call cell phone was forwarded to the Judge's personal cell phone, i.e., the two numbers listed as the originating number / terminating number both belong to Judge Huckabee (*Id*., ¶ 51).

Mr. Banks was informed that the blood draw was going to be performed (*Id*., ¶ 52).   Mr. Banks was placed in the restraint chair by officers other than Officer Moore (*Id*., ¶ 53).   Mr. Banks was told that there was a warrant (*Id*., ¶ 54).   At approximately 7:00 a.m., Allison Anderson, a paramedic with EASI, a local ambulance service, performed the blood draw on Mr. Banks's right arm (*Id*., ¶ 55).   Ms. Anderson noted the "strong smell of ETOH coming from" Mr. Banks (*Id*., ¶ 56).

Mr. Banks was returned to the jail cell and was incarcerated until he bonded out several hours later (*Id*., ¶ 58).   Chief Powell told Mr. Banks that she would look into the stop and get back with him regarding what she would do about it (*Id*., ¶ 59).

The contents of the cup found in Mr. Banks's vehicle as well as Mr. Banks's blood sample were sent to the Arkansas State Crime Lab for testing (*Id*., ¶ 60).   The test results returned a finding that the contents of the cup were 12% ethanol, and the contents of Mr. Banks's blood sample was 0.043% ethanol (*Id*., ¶ 61).   The margin of error was .002% (*Id*.).   The forensic toxicologist who performed the tests on both the contents of the cup and on Mr. Banks's blood sample was William

R. Pope, who tests biological samples for the presence or absence of drugs and/or alcohol (*Id.*, ¶ 62).  Mr. Pope testified that the samples were collected in July 22, 2018, and were submitted to the crime lab December 31, 2018, which is "a little longer than normal, but not outside of the range that the data would still be reliable" and that "it's still a reliable source of blood for analysis." (*Id.*, ¶ 63).  Overtime, if a person does not continue drinking, blood alcohol will decrease (*Id.*, ¶ 64).  It can be expected that over a four-hour window, that a blood alcohol concentration would decrease, and that it would have probably been higher earlier (*Id.*, ¶ 65).   The tubes in which substances are collected have antibacterial in them in order to prevent bacterial production and an anticoagulant (*Id.*, ¶ 66).  Mr. Pope testified that he did not believe that the samples being exposed to extreme heat would affect them much (*Id.*, ¶ 67).

Mr. Banks was charged with violations of the following:  Arkansas Code Annotated § 5-65-103 (DWI); Arkansas Code Annotated § 5-71-218 (Open Container); Arkansas Code Annotated §5-65-205 (Refusal to Submit to Chemical Test); and Arkansas Code Annotated § 12-12-1006 (Fingerprinting Refusal) (*Id.*, ¶ 68).  All of the charges were later dropped (*Id.*).

The only injury that Mr. Banks saw a doctor for as a result of anything that occurred on July 22, 2018, with regard to his interactions with members of the EPD were about the "bumps" on him; he went a "while" later (*Id.*, ¶ 69).  Mr. Banks was told the bumps were "some fungus or bacteria" and was given a steroid shot and some antibiotic pills "to clear it up" (*Id.*, ¶ 70).

Other than the incident involving Officer Moore, Mr. Banks has had no further contact with any members of the EPD, except for answering questions at his brother's house regarding a girl who was shot to which members of the EPD responded (*Id.*, ¶ 72).  Mr. Banks had no issues with members of the EPD during that encounter because the EPD has "a whole new crew" and "they seemed like some fairly good guys" (*Id.*, ¶ 73).  Mr. Banks has no background, training, or

education in law enforcement and has no knowledge with respect to how the EPD trains or hires its officers (*Id.*, ¶ 74).

The EPD does not have a blood draw policy (*Id.*, ¶ 75).  The City's policies with respect to the EPD have to be approved by the City Council (*Id.*, ¶ 76).  Chief Powell was the Chief of Police for the EPD from February 1, 2017, until January 16, 2019 (*Id.*, ¶ 77).  Officer Moore was hired by Chief Powell as a part-time EPD officer on July 25, 2017, was promoted to a full-time officer on March 19, 2018, and was dismissed from the EPD on or about August 8, 2018, in connection with an incident and complaint that occurred after the arrest of Mr. Banks that did not involve Mr. Banks (*Id.*, ¶ 78).

Before Chief Powel hired Officer Moore, she performed a background check, such that it would be approved by standards, and she spoke to his former employee, the Sheriff of Lonoke County, John Staley, who said that Moore was a good officer, but did not fit in with where Staley was trying to take the department (*Id.*, ¶ 79).

Officer Moore was issued the City's policies regarding command authority, court procedures, intoxicants and non-prescribed drugs, line of duty deaths, personal grooming, standards of conduct, uniform regulations, and unsafe acts on July 30, 2017 (*Id.*, ¶ 80).  At the time that Officer Moore was hired at the EPD, he had served 24 years in the Army, had 16.8 years of prior law enforcement experience, and held the basic law enforcement certification (*Id.*, ¶ 81).  At the time of the stop of Mr. Banks, Officer Moore had approximately a minimum of 1812.75 hours of law enforcement training (*Id.*, ¶ 82).

During Chief Powell's tenure, she had Dr. Matthew Pate, who has a Ph.D. in criminal justice, come to the EPD and instruct the officers about constitutional issues and law and mandatory reporting (*Id.*, ¶ 83).  The EPD has official written policies that dictate that all its sworn

officers must uphold the Constitution of the United Statas, the Arkansas Revised Statutes, that all officers shall obey the constitutional, civil, and criminal laws of the city, state and federal government, and the ordinances of the City of England, and that conduct violative of the policies includes, but is not limited to committing a willful violation of constitutional civil rights that demonstrates reckless disregard, refusing or failing to protect a prisoner's civil rights when such need is made known or should have been known by a competent officer, and using excessive force to hold, affect an apprehension, arrest or detain any person (*Id.*, ¶ 84).

### B.   Legal Standard

#### 1.   Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar

summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### 2.      Liability Under 42 U.S.C. § 1983

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Municipalities and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). A suit against a municipal employee in his or her official capacity is treated as a suit against the municipality for which the employee works. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013). A municipality is not liable under § 1983 unless there is an unconstitutional act by one of its employees and its official policy or custom caused the act. *Monell*, 436 U.S. at 694; *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018); *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th

Cir. 2006) ("[T]o establish the liability of an official acting in his official capacity, the plaintiff must prove that a policy or custom of the city caused the alleged violation." (cleaned up and citation omitted)).

### 3.      Qualified Immunity

Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense.  This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies:  "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* Courts may begin the analysis with either step.  *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).  If a plaintiff cannot satisfy both prongs, then the defendant is entitled to qualified immunity. *See Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019); *see also Davis v. Chase Cnty. Sch. Dist. No. 536*, No. 7:17-CV-5007, 2019 WL 1506690, at *4 (D. Neb. Apr. 5, 2019) ("To withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right.").

### 4.      ACRA Claims

Mr. Banks bring claims pursuant to the ACRA, the ACRA prohibits persons, acting under color of state law, from depriving any person of any rights, privileges, or immunities secured by the Arkansas Constitution.  Ark. Code Ann. § 16-123-105; *see also West v. Atkins*, 487 U.S. 42

(1988).  The ACRA expressly requires that courts look to federal civil rights law for guidance.  *See*

*Island v. Buena Vista Resort*, 103 S.W.3d 671, 675–76 (Ark. 2003).   As relevant, here, the

Arkansas Supreme Court has stated that Article 2, § 15 of the Arkansas Constitution is "virtually

identical to the Fourth Amendment" and will be interpreted "in the same manner as the United

States Supreme Court interprets the Fourth Amendment."  *Rainey v. Hartness*, 5 S.W.3d 410, 415

(Ark. 1999).   Claims of "violation of freedom of speech" under the Arkansas Constitution pursuant

to the ACRA also require the lack of probable cause.  *See Smith v. Insley's Inc.*, 499 F.3d 875, 882

(8th Cir. 2007) ("The ACRA provides a cause of action for damages for 'the deprivation of any

rights. . . secured by the Arkansas Constitution' by any person acting under color of state law,"

and "further provides that, in construing this section, 'a court may look for guidance to state and

federal decisions interpreting . . . 42 U.S.C. § 1983'" (quoting Ark. Code Ann. § 16–123–105)).

For this reasons, Mr. Banks's federal First Amendment claim brought under § 1983, and his state

claim brought under the ACRA to extent those rights under Arkansas law equate to those rights

under federal law, turn on whether probable cause for his arrest existed.  As a result, this Court

determines that its analysis of Mr. Banks's federal constitutional claims under § 1983 is equally

applicable to his state constitutional claims under the ACRA to the extent those rights under

Arkansas law equate to those rights under federal law.

> C.     **Analysis**

> > 1.     **Fourth Amendment Claims Against Officer Moore Individually**

Qualified immunity shields government officials from suits for damages under § 1983 if

their "conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019), *as*

*amended* (Nov. 26, 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "The immunity is an *immunity from suit*, not merely from liability."  *Id.*

Qualified immunity is designed "to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982)).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Anderson ex rel. Anderson v. City of Minneapolis*, 934 F.3d 876, 881 (8th Cir. 2019) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A traffic stop constitutes a seizure under the Fourth Amendment."  *United States v. Peralez,* 526 F.3d 1115, 1119 (8th Cir. 2008) (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)).  "Because a traffic stop is a seizure that implicates the Fourth Amendment, it therefore must be judged for its reasonableness in light of the circumstances."  *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *Wren v. United States,* 517 U.S. 806, 810 (1996).  "Any traffic violation, however minor, provides probable cause for a traffic stop."  *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *see also United States v. $45,000.00 in U.S. Currency*, 749 F.3d 709, 715 (8th Cir. 2014).  "The government bears the burden of establishing that probable cause existed."  *United States v. $45,000.00 in U.S. Currency*, 749 F.3d at 716; *see also United States v. Andrews,* 454 F.3d 919,

922 (8th Cir. 2006). "In determining whether an officer had reasonable suspicion, we consider the totality of the circumstances." *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021).

Further, the objective standard governing an officer's decision to stop a motorist protects officers who have a mistaken belief that a traffic law is being broken. *See United States v. Sanders,* 196 F.3d 910, 913 (8th Cir. 1999) ("Even if the trailer was not technically in violation of the statute, [the officer] could have reasonably believed that the trailer violated the statute. . . ."); *United States v. $45,000.00 in U.S. Currency,* 749 F.3d at 715. "Probable cause [also] exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (citing *United States v. Andrews*, 454 F.3d at 921). "Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop," and "[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop." *Id.* (citing *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id.* (citations omitted).

"A seizure justified only by a police-observed traffic violation, become[s] unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (internal citations omitted). "Under the Fourth Amendment, an officer may not extend a traffic stop longer than 'the time needed to handle the matter for which the stop was made' unless he has reasonable suspicion of criminal activity." *United States v. Pacheco*, 996 F.3d at 511 (citing *Rodriguez v. United States*, 575 U.S. 348, 350, 358 (2015)). "Reasonable suspicion requires an officer to have 'a particularized

and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" *Id.* (citing *United States v. Jones*, 606 F.3d 964, 965-66 (8th Cir. 2010)). "Although a mere hunch is insufficient to establish reasonable suspicion, 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* at 511-12 (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "[F]actors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *United States v. Stewart,* 631 F.3d 453, 457 (8th Cir. 2011) *see also United States v. $45,000.00 in U.S. Currency*, 749 F.3d at 720–21.

Mr. Banks argues that the first Fourth Amendment violation was the stop itself (Dkt. No. 60, at 3). Mr. Banks asserts that he "had committed no crime" and that mere nervousness, standing alone, cannot constitute reasonable suspicion of criminal activity and grounds for detention (*Id.*) Mr. Banks cites to *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998), for the proposition that nervousness is commonplace when one is confronted by a law enforcement officer (*Id.*, at 4). Mr. Banks maintains that the second Fourth Amendment violation was "providing a materially false affidavit to obtain a search warrant seeking judicial imprimatur on a 1st Amendment violation." (Dkt. No. 60, at 4). Mr. Banks contends that the third Fourth Amendment violation was proceeding with the blood draw outside of the four hour window without the supervision of a physician. Finally, Mr. Banks reiterates that he committed no crime sufficient to support a blood draw. The Court will discuss each of Mr. Banks's arguments in turn.

### a.   Probable Cause For The Stop

As set forth above, probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair

probability that a violation of law had occurred. *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (citing *United States v. Andrews*, 454 F.3d at 921). An officer's incomplete initial observations may give reasonable suspicion for a traffic stop, and objectively reasonable mistakes of law or fact may still justify a valid stop. *Id.* (citing *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). In forming a basis for reasonable suspicion, an officer may draw upon their own experience and specialized training to make inference from and deductions about the information available to them that might elude an untrained person. *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003), (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Here, Officer Moore had probable cause to stop Mr. Banks based on his belief that Mr. Banks committed a traffic violation because he was speeding on Taylor Street. *See United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994) (en banc). Additionally, Officer Moore had reasonable suspicion to stop Mr. Banks because, confronted with the facts known to Officer Moore at the time, he could have believed based on his knowledge and experience that there was a fair probability that a violation of law had occurred. *See United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (citing *United States v. Andrews*, 454 F.3d at 921). In his report, Officer Moore noted intelligence regarding a gang network driving in from Little Rock to steal and carry away trailers and farm equipment. Officer Moore had made a recent arrest of a stolen trailer, and he knew from experience that suspects used the back roads to navigate around the city, much like Mr. Banks's vehicle. Based on Officer Moore's experience, it is common for a person who is wanted to drive directly with a series of left or right turns and return to their safe space from which they left. The informant stated that they attempted to steal the equipment between 1:00 a.m. and 5:00 a.m. Mr. Banks was stopped in a pickup truck, with a license plate number returned from Little Rock at approximately 3:00 a.m. Officer Moore was not familiar with Mr. Banks's vehicle. Mr.

Banks does not deny that he drove in a circle.  Based on the evidence in the record, the Court determines that Officer Moore had a particularized and objective basis to stop Mr. Banks and investigate the activity of Mr. Banks.  Accordingly, Officer Moore did not violate Mr. Banks's Fourth Amendment rights when he stopped initially Mr. Banks.

### b.      Probable Cause For The Warrant

Mr. Banks claims that his blood was drawn without his consent in violation of his Fourth Amendment rights.  Arkansas Code Annotated § 5-65-202(c) provides:

> Absent exigent circumstances, a test of a person's blood under this section to determine the person's alcohol concentration, controlled substance content, or other intoxicating substance content in his or her blood requires a warrant based on probable cause that the person was operating or in actual physical control of a motorboat on the waters of this state or a motor vehicle while intoxicated or the person's express consent to the test.

Here, Officer Moore obtained a warrant to draw and test Mr. Banks's blood.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Messerschmidt*, 565 U.S. 535, 546 (2012) (citing *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).  "[T]he fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness."  *Id.* at 547.

The Supreme Court "ha[s] recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'"  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The threshold for establishing this exception is a high one.  As the Court explained in *Leon,* "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's

responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Leon,* at 921; *see also Malley,* 475 U.S. at 346 n.9 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable" (internal quotation marks and citation omitted)).

In *Franks,* the Supreme Court held that a search warrant must be voided and the fruits of the search suppressed if a defendant proves by a preponderance of the evidence that: (1) a law enforcement officer knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause. *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008) (citing *Franks*, 438 U.S. at 155–56; *United States v. Snyder,* 511 F.3d 813, 816 (8th Cir. 2008)). "In determining if 'an affiant's statements were made with reckless disregard for the truth,'" the test "'is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) (quoting *United States v. Butler,* 594 F.3d 955, 961 (8th Cir. 2010)). "A showing of deliberate or reckless falsehood is not lightly met." *Id.* (quotation and citation omitted).

Mr. Banks has not established on the record before the Court that Officer Moore's search warrant application contains material misrepresentations of fact, knowing and intentionally made or with reckless disregard for the truth or that the affidavit's remaining content failed to establish probable cause. Mr. Banks was the operator of a 2016 GMC Sierra pickup that Officer Moore

pulled over at 0251 hours on July 22, 2018.  Officer Moore smelled alcohol on Mr. Banks's breath, as did Officer Williamson and paramedic Anderson.  Officer Moore observed Mr. Banks's speech to be very lethargic and words slurred.  Even if Officer Moore was incorrect about that, as Mr. Banks suggests, Mr. Banks has not established on the record before the Court that Officer Moore's statement to that affect in the affidavit was knowingly and intentionally false or that the statement was made with reckless disregard for the truth.

Officer Moore stated that Mr. Banks's eyes were bloodshot, red, and watery.  Officer Williamson also stated that Mr. Banks's eyes were bloodshot and watery (Dkt. No. 59, ¶ 26).  There is no evidence in the record to dispute that Mr. Banks refused the PBT.  It is also undisputed that Officer Moore discovered an open container that contained alcohol in Mr. Banks's vehicle.  At his deposition, Mr. Banks claimed that he was not offered a breathalyzer test at the police station, but he also stated that even if he had been offered a breathalyzer test at the station, he would have refused to take it (Dkt. No. 59-4, at 67-70).  Accordingly, Mr. Banks has not established from evidence in the record that Officer Moore's statement that Mr. Banks refused to take a breathalyzer test at the police station is false or misleading.

Mr. Banks asserts that based on the toxicology tests, Mr. Banks's testimony, and his brother's affidavit that a reasonable juror could conclude that Officer Moore fabricated evidence that he was intoxicated (Dkt. No. 60, at 4).  Mr. Banks's denial that he had been drinking, his brother's statement that he did not see his brother drinking, and the toxicology report that found that Mr. Banks's blood sample was .043% ethanol and the contents of the cup found in Mr. Banks's car was 12% ethanol when considered individually or taken together do not negate the information in the affidavit or establish that Officer Moore knowingly and intentionally included false information in his affidavit upon which a neutral Judge found probable cause.  The Court

32

determines that a reasonable juror could not conclude based on the undisputed evidence that Officer Moore fabricated evidence in his affidavit in order to obtain a warrant.

> ### c.    Proceeding With The Blood Draw Outside The Four Hour Window

Finally, Mr. Banks claims that Officer Moore erred by proceeding with the blood draw on Mr. Banks outside of the four hour window after the traffic stop of Mr. Banks.  Mr. Banks states that under Arkansas law when a person submits to a blood test at the request of a law enforcement officer, "blood may be drawn by a physician or a person acting under the direction and supervision of a physician. . . .  But the blood must be drawn within the 4 hour window." (Dkt. No. 60, at 5). Mr. Banks claims this failure to follow Arkansas law violated the Fourth Amendment.

Arkansas's Implied Consent statute specifically provides for a test of a person's blood to determine the person's alcohol concentration, but it requires a warrant based on probable cause that the person was operating or in actual physical control of a motor vehicle while intoxicated. Ark. Code Ann. § 5-65-202(c).

A separate Arkansas statute provides for the admissibility of evidence in prosecution and more specifically evidentiary presumptions.  *See* Ark. Code Ann. § 5-65-206.  That statute provides that a person charged with a violation of Arkansas Code Annotated § 5-65-103 is presumed not intoxicated if the alcohol concentration is less than 0.04 as shown by chemical analysis at the time or within four hours after the alleged offense.  *See* Ark. Code Ann. § 5-65-206. The statute does not provide that a blood draw must occur within four hours as Mr. Banks urges. A separate Arkansas statute provides that "[b]lood may be drawn by a person who is licensed, certified, or otherwise authorized by law to perform venous blood draws when a person consents to the procedure or when a warrant or court order has been issued to take a sample of the person's

blood." Ark. Code Ann. § 5-65-204. The statue does not provide, as Mr. Banks suggests, that a blood test must be taken under the direction of a physician in order to be valid.

Even if the Arkansas statutes could be read as Mr. Banks suggests, Mr. Banks has not established how an alleged failure to follow the procedure set forth in the Arkansas statutes to create a presumption for the admissibility of evidence equates to a violation of the Fourth Amendment. Mr. Banks has not cited the Court to any law to support this leap, and the Court is not aware of any. No reasonable juror could conclude that a violation of Arkansas's laws related to the admissibility of evidence for prosecution violate the Fourth Amendment.

### 2. First Amendment Claims Against Officer Moore Individually

Mr. Banks claims that Officer Moore violated his First Amendment right and his right to remonstrate under the Arkansas Constitution by arresting him (Dkt. No. 8, ¶¶ 36, 37). The First Amendment includes the right to be free from retaliatory arrest, a necessary element of which is "[l]ack of probable cause." *See Galarnyk v. Fraser,* 687 F.3d 1070, 1076 (8th Cir. 2012) (alteration in original) (internal quotation marks omitted) (citing *McCabe v. Parker,* 608 F.3d 1068, 1075 (8th Cir. 2010)). Thus, if Mr. Banks can show that Officer Moore arrested him without probable cause in violation of his First Amendment rights, then he has established a violation of § 1983. Further, Mr. Banks's claim of "violation of freedom of speech" under the Arkansas Constitution pursuant to the ACRA also requires the lack of probable cause. *See Smith v. Insle's Inc.*, 499 F.3d 875, 882 (8th Cir. 2007) ("The ACRA provides a cause of action for damages for 'the deprivation of any rights . . . secured by the Arkansas Constitution' by any person acting under color of state law," and "further provides that, in construing this section, 'a court may look for guidance to state and federal decisions interpreting . . . 42 U.S.C. § 1983'" (quoting Ark. Code Ann. § 16–123–105)). For this reason, Mr. Banks's federal First Amendment claim brought under § 1983, and his state

claim brought under the ACRA to the extent those rights under Arkansas law equate to those rights under federal law, turn on whether probable cause for his arrest existed. The Court will analyze the state and federal constitutional claims together.

"Probable cause exists if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense.'" *Copeland v. Locke,* 613 F.3d 875, 879 (8th Cir. 2010) (alteration in original) (quoting *Flynn v. Brown,* 395 F.3d 842, 844 (8th Cir. 2005) (quoting *Hannah v. City of Overland,* 785 F.2d 1385, 1389 (8th Cir. 1986))). "[P]robable cause or arguable probable cause is fatal to a First Amendment retaliation claim." *Garcia v. City of New Hope*, 984 F.3d 655, 670 (8th Cir. 2021) (citing *Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." *Bell v. Neukirch*, 979 F.3d 594, 607 (8th Cir. 2020) (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)). Whether the police had probable cause at the time of the arrest is a question of law for a court to decide. *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010).

In *Smithson v. Aldrich,* 235 F.3d 1058 (8th Cir. 2000), the Eighth Circuit found that probable cause could constitute the "other basis" to justify an arrest and preclude the inquiry into the police officer's arresting motive. In *Smithson,* the Eighth Circuit held that a law enforcement officer is shielded by qualified immunity from a First Amendment retaliation claim if the officer had probable cause to arrest the plaintiff. *Smithson,* 235 F.3d at 1063. Further, if officers have probable cause, the arrests do not violate the Fourth Amendment and the officers are not liable. *Fisher*, 619 F.3d at 818 (quoting *Smithson*, 235 F.3d at 1063). It is not necessary for defendants to have had probable cause to arrest Mr. Banks for every crime with which he was charged. *See*

*Campbell v. Sletten*, 198 F.3d 249 (8th Cir. 1999) (citing *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1080 (8th Cir. 1990) ("If an officer had probable cause to arrest an individual for committing a certain crime it is immaterial that the officer thought, even mistakenly, that he had probable cause to arrest the individual for a second crime.")).  Further, it is not necessary for the offense establishing probable cause to be "closely related" to or based on the same conduct as the offense identified by the arresting officer at the time of arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

At the scene, Officer Moore requested another patrol unit to come to the scene and to bring a portable breathalyzer test ("PBT") to administer after he conducted field sobriety tests on Mr. Banks (Dkt. No. 59, ¶ 20).  Officer Moore advised Mr. Banks that another officer was coming to the scene with a portable breath alcohol test, and Mr. Banks responded, "I don't care what you have over here, until you tell me why you stopped me," and "I am not taking nothing until you tell me why you stopped me and you have not told me that." (*Id.*, ¶ 21).  Officer Moore told Mr. Banks to relax and then instructed Mr. Banks to sit on his tailgate.  Rather than cooperate, Mr. Banks began to get loud and stood in the middle of the street yelling at Officer Moore that Officer Moore might as well arrest him and tow his truck because Mr. Banks had a lawyer and would own Officer Moore and his job (*Id.*, ¶ 22).  Officer Moore told Mr. Banks that he was being arrested for "obstructing" (Dkt. No. 50-1).

Under Arkansas law, a person commits the offense of obstructing governmental operations if the person "knowingly obstructs, impairs, or hinders the performance of any governmental function."  Ark. Code Ann. § 5-54-102.  A "governmental function" is defined as "any activity that a public servant is legally authorized to undertake on behalf of any governmental unit he or she serves."  Ark. Code Ann. § 5-54-101.  Under Arkansas law, a person commits the offense of

disorderly conduct if, "with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:  (1) [e]ngages in fighting or in violent, threatening, or tumultuous behavior; (2) [m]akes unreasonable or excessive noise."  Ark. Code Ann. § 5-71-207(a)(1) and (2).

The Court determines that based on the undisputed evidence that no reasonable juror could find that Officer Moore did not have probable cause or arguable probable cause to arrest Mr. Banks.  The undisputed evidence indicates that Mr. Banks was standing in the middle of the street yelling at Officer Moore that he would not take a PBT, that he would not take a field sobriety test, and telling Officer Moore to arrest him and tow his truck.

Mr. Banks argues that Officer Moore's testimony admitting that "he went to the Judge because Plaintiff had been abrasive" provides "direct evidence to support his First Amendment claim." (Dkt. No. 60, at 5).  Officer Moore testified, " . . . [h]e kind of forced my hand.  Once I go there, I said, well, he's really abrasive to me. . . . he said several times he would own me and lose my job, he was going to sue me, I said, well, let me talk to a judge." (Dkt. No. 59-7, at 60-61).  Officer Moore also testified that normally when someone refuses a breathalyzer test, "that they are automatically guilty of DUI.  Once again, because of the fact that when someone's yelling and you threaten to sue me, you threaten to take my livelihood away from my job, I'm going to try to give you an extra step to say that was—it's not your word against my word, but this is a fact.  I mean a fact is kind of hard to—hard to beat, you know when it comes to probable cause." (*Id*., at 64-65).

Officer Moore's state of mind when making the arrest is not relevant to the probable cause inquiry, and the fact that Mr. Banks was charged ultimately with violating different Arkansas statutes does not negate probable cause or arguable probable cause for the arrest. *See Devenpeck*, 546 U.S. at 153 ("an arresting officer's state of mind (except for the facts that he knows) is

irrelevant to the existence of probable cause. . . . [t]hat is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

### 3.    Due Process Claims Against Officer Moore Individually

Mr. Banks claims that Officer Moore violated his rights to procedural due process by failing to follow the process set forth in Arkansas Code Annotated § 5-65-202(c) for obtaining a warrant in order to draw and test his blood (Dkt. No. 60, at 9).  As set forth in detail above, however, the Court determines that no reasonable juror could conclude that Officer Moore did not follow the proper procedure to obtain the warrant signed by Judge Huckabee.

Mr. Banks claims that Officer Moore violated his substantive due process rights because they drew his blood without a warrant (Dkt. No. 8, ¶¶ 21-32).  Here, the Court has determined that Mr. Banks's blood draw was not warrantless.  Accordingly, the Court determines based on the undisputed evidence in the record that no reasonable juror could conclude that Mr. Banks's substantive due process rights were violated.

Accordingly, based on the record before the Court, the Court grants Defendants' joint motion for summary judgment on Mr. Banks's substantive and procedural due process claims.

### 4.    Claims Against The City

To survive summary judgment, Mr. Banks must demonstrate some municipal action or inaction, taken "with 'deliberate indifference' as to its known or obvious consequences," *id.* at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)), caused his injuries.  *See Szabla*, 486 F.3d at 390–91.  However, nothing in the record enables Mr. Banks to meet "the rigorous, deliberate indifference standard of fault." *Id.* at 395.  Mr. Banks sued Officer Moore in his official capacity, alleging that Officer Moore's alleged unconstitutional actions were a result of a failure to train Officer Moore on the probable cause necessary for arrest (Dkt. No. 8, ¶ 30).  Mr. Banks

also asserts that his blood was seized without probable cause and without a proper warrant, "in accordance with City policy and custom." (*Id.*, ¶ 31).  Defendants assert that there is no merit to either of Mr. Banks's claims against Officer Moore in his official capacity and that the City is entitled to summary judgment (Dkt. No. 51, at 37).

Because the Court finds that Mr. Banks has not established an underlying constitutional violation, the City cannot be liable for any alleged violation.  The Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."  *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (quoting *McCoy v. City of Monticello,* 411 F.3d 920, 922 (8th Cir. 2005)).   However, even where "a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee[,]" that fact "will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 406–07 (1997) (italics in original).

Mr. Banks's failure to train claim against Officer Moore in his official capacity fails.  First, "respondeat superior is inapplicable to claims under 42 U.S.C. § 1983."  *Bell v. Kan. City Police Dep't,* 635 F.3d 346, 347 (8th Cir.2011) (per curiam).  Second, this Court determines that Officer Moore is entitled to qualified immunity and did not violate Mr. Banks's constitutional rights; therefore, Mr. Banks's "failure to train and failure to supervise claims. . . [can]not be sustained absent an underlying constitutional violation by the officer."  *Sitzes v. City of W. Memphis Ark.,* 606 F.3d 461, 470–71 (8th Cir.2010) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam); *Monell,* 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Royster v. Nichols*, 698 F.3d 681, 692–93 (8th Cir. 2012); *Sanders v. City of Minneapolis,*

*Minn.,* 474 F.3d 523, 527 (8th Cir.2007) ("Without a constitutional violation by the individual

officers, there can be no § 1983 or *Monell* failure to train municipal liability.")).

To the extent Mr. Banks purports to assert against Officer Moore in his official capacity a

claim that the constitutional violations stemmed from an official policy or custom, *Monell* holds a

municipality liable for actions of its employees or agents that violate a plaintiff's constitutional

rights if the violation stemmed from an official municipal policy or custom.   436 U.S.at 694-

95; *Ulrich*, 715 F.3d at 1061.   "There must be a causal connection between the municipal policy

or custom and the alleged constitutional violation in order to state a valid claim under § 1983."

*Ulrich*, 715 F.3d at 1061 (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)); *see also*

*Waters v. Madson*, 921 F.3d 725, 743 (8th Cir. 2019).   Because Mr. Banks fails to establish a

constitutional violation by Officer Moore, there can be no § 1983 or *Monell* policy or custom

claim.

Even if Mr. Banks had established an underlying constitutional violation on the part of

Officer Moore, that alone would not permit him to prevail on his claims against Officer Moore in

his official capacity.   With respect to Mr. Banks's claim for inadequate training or supervision, a

state actor may be liable for inadequate training or supervision of its employees "where (1) the . .

. training practices [were] inadequate; (2) the [state actor] was deliberately indifferent to the rights

of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice

by [the state actor]'; and (3) an alleged deficiency in the . . . training procedures actually caused

the plaintiff's injury."  *Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of*

*Canton v. Harris,* 489 U.S. 378, 389 (1989)); *see also Parrish v. Ball*, 594 F.3d 993, 997–98 (8th

Cir. 2010).

The Court notes that, in his amended complaint, Mr. Banks asserts that Defendants failed to train properly employees, but even if certain employees or agents received training that was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train, even if there is an underlying constitutional violation on the part of the officer.  *City of Canton,* 489 U.S. at 390-91.  Instead, to satisfy the standard, along with an underlying constitutional violation on the part of the officer, a § 1983 plaintiff must demonstrate that in the light of the duties assigned to specific employees the need "for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."  *Id.* at 390.  A § 1983 plaintiff must demonstrate that the state actor "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'"  *Andrews,* 98 F.3d at 1076 (quoting *Thelma D. v. Bd. of Educ.,* 934 F.2d 929, 934 (8th Cir. 1991)).

Even if Mr. Banks could demonstrate an underlying constitutional violation, no reasonable factfinder could determine he met this standard on the record evidence with all reasonable inferences drawn in his favor.  During Chief Powell's tenure, Dr. Matthew Pate, who has a Ph.D. in criminal justice, instructed officers about constitutional issues, law, and mandatory reporting.  At the time of the stop of Mr. Banks, Officer Moore had approximately a minimum of 1812.75 hours of law enforcement training (*Id*., ¶ 82).  The EPD also has official written policies that dictate that all its sworn officers must uphold the Constitution of the United States, the Arkansas Revised Statutes, that all officers shall obey the constitutional, civil, and criminal laws of the city, state, and federal government, and the ordinances of the City of England, and that conduct violative of the policies includes, but is not limited to committing a willful violation of constitutional civil rights that demonstrates reckless disregard, refusing or failing to protect a prisoner's civil rights

when such need is made known or should have been known by a competent officer, and using excessive force to hold, affect an apprehension, arrest, or detain any person (*Id.*, ¶ 84). The Court determines, based on the undisputed evidence in the record, that a reasonable juror could not conclude that there was an obvious need for more training.

With respect to Mr. Banks's claim that the purported underlying constitutional violation stemmed from an official policy or custom, because a municipality cannot be liable on a *respondeat superior* theory, "the pattern of unconstitutional conduct must be so pervasive and widespread so as to have the effect and force of law." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (internal quotations and citations omitted). Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability. *See Brown*, 520 U.S. at 409; *Szabla*, 486 F.3d at 392–93. "A single incident normally does not suffice to prove the existence of a municipal custom." *Mettler v. Whitledge*, 165 F.3d 1197, at 1205 (8th Cir. 1999). Even if Mr. Banks could demonstrate an underlying constitutional violation, which this Court determines he cannot, the undisputed evidence is that this the only interaction that Mr. Banks ever had with Officer Moore occurred on July 22, 2018. Mr. Banks has not produced or identified a policy that caused his alleged injury and, other than the single incident at issue in this case, Mr. Banks has submitted no evidence of interactions with Officer Moore or any other police officer with the City similar to the one at issue in this case. The Court determines, based on the undisputed evidence in the record, that a reasonable juror could not conclude that Mr. Banks has established an unconstitutional policy or custom.

### 5.    State Law Claims

Mr. Banks asserts other state law claims of assault and battery, malicious prosecution, abuse of process, and felony tort (Dkt. No. 8, ¶¶ 44-54). Mr. Banks asserts that the assault and

battery at issue was the blood draw (Dkt. No. 60, at 9). Because the Court grants summary judgment in favor of Defendants on Mr. Banks's federal claims, the Court declines to exercise supplemental jurisdiction over Mr. Banks's remaining state law claims.

### III.    Conclusion

For the reasons set forth above, the Court grants Defendants' joint motion for summary judgment (Dkt. No. 49). The Court dismisses with prejudice Mr. Banks's federal constitutional claims brought against Officer Moore in his individual capacity under § 1983 and state constitutional claims brought against him in his individual capacity under the ACRA to extent those rights under Arkansas law equate to those rights under federal law. The Court dismisses with prejudice Mr. Banks's federal constitutional claims brought against Officer Moore in his official capacity under § 1983 and state constitutional claims brought against him in his official capacity to the extent those rights under Arkansas law equate to those rights under federal law. The Court declines to exercise jurisdiction over Mr. Banks's remaining state law claims. The Court denies Mr. Banks's motion for stay and request for hearing (Dkt. No. 58).

So ordered this 31st day of March, 2021.

Kristine G. Baker
United States District Court Judge